

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-15-2004

# Whiting v. Krassner

Precedential or Non-Precedential: Precedential

Docket No. 03-1276

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Whiting v. Krassner" (2004). *2004 Decisions.* Paper 18.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/18

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-1276

———

CATHLEEN CARMEN MARY WHITING

v.

PETER L. KRASSNER,
a/k/a MIKE CIMINO

Peter Krassner, Appellant

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 02-cv-05861)
District Judge: Honorable Garrett E. Brown, Jr.

———

Argued September 28, 2004

Before: RENDELL, FUENTES and SMITH, Circuit Judges.

(Filed December 15, 2004)

———

John C. O'Quinn   (ARGUED)
Kirkland & Ellis
655 15th Street, N.W.
Suite 1200
Washington, DC  20005
   Counsel for Appellant

Celso M. Gonzalez-Falla     (ARGUED)
109 East 64th Street, Fifth Floor
New York, NY  10021
   Counsel for Appellee

---

OPINION OF THE COURT

---

RENDELL, <u>Circuit Judge</u>.

On March 19, 2002, Cathleen Carmen Mary Whiting initiated an action under The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501 ("The Hague Convention") for the return of her daughter, Christina, to Canada.  Christina had been taken by her father, Peter Krassner, to the United States without Whiting's consent.  After an expedited hearing, the District Court, in a lengthy oral opinion, determined that Christina's place of habitual residence at the time of her removal from Whiting's custody was Canada, and ordered that Christina be returned to Whiting's custody in Canada pursuant to the Convention and the International Child Abduction Remedies

-2-

Act, 42 U.S.C. § 11601 <u>et seq</u>. The District Court also granted Whiting's request for attorneys' fees and costs pursuant to 42 U.S.C. § 11607(b)(3), ordering Krassner to pay such fees and costs in the amount of $46,441.68. Krassner appeals the District Court's order. This appeal followed, an appeal in which both parties have been superbly represented by appointed counsel. The parties have addressed the issue of whether this appeal is moot given Christina's return to Canada, but Whiting urges that Krassner should be judicially estopped from asserting that it is not moot because he took a contrary position earlier in the course of this litigation.

The District Court had jurisdiction over Whiting's petition pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 11603(a). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons that follow, we find that Krassner is not judicially estopped from asserting that the case is not moot and, further, that the case is not moot. We will affirm the District Court's holding that Canada was Christina's place of habitual residence at the time of her removal.

I. Factual and Procedural Background

Christina Krassner was born on September 6, 2000, in Plainview, New York to Whiting and Krassner. The two were unmarried at the time and never married subsequently. Whiting and Krassner resided together with Christina in New York until October 19, 2001. By that time, their relationship had become acrimonious. This acrimony and the couple's desire to live apart

were intensified by the tragic events of September 11, 2001, and the two separated and Whiting took Christina to live with her in Canada. Soon after September 11, the parties reached an agreement as to the custody of their daughter, which they memorialized in a custody agreement ("Agreement"). Krassner, with the help of his father, drafted the first version of the Agreement, which he then presented to Whiting as a condition of her departure with Christina for Canada. The Agreement was then modified to reflect Whiting's suggested changes and signed by both parties on October 19, 2001.

In pertinent part, the Agreement provided that both parties would retain joint custody of Christina, that Whiting was returning to Canada as a result of the events of September 11, 2001, and that Krassner would have the right to have Christina with him for a period of thirty (30) to forty-five (45) days during the summer. The Agreement also stipulated that Whiting and Christina would reside in Wallaceburg, Ontario, Canada, and that Whiting could not move her residence without Krassner's knowledge. Most importantly for our purposes, the Agreement contained provisions concerning the length of Christina's stay in Canada. It provided that Christina would be returned to the United States "no later than October 19, 2003 as long as there is no imment [sic] danger of constant terroist [sic] attacks" and as long as Whiting was "legally allowed to recide [sic] and work in the United States."[1]

---

[1] At the time the Agreement was signed, Whiting was not legally permitted to reside or work in the U.S. and, therefore, would have been unable to be the custodial parent of Christina

-4-

After signing the Agreement, Whiting left with Christina on a bus for Canada. There, the two lived with Whiting's mother for approximately two weeks before moving into a two-bedroom apartment across the hall from Whiting's mother and in close proximity to her sister. Whiting began to look into childcare programs and applied for the necessary documentation for Christina to live in Canada, including a medical card. The parties agreed that Krassner would come to Canada to visit during the Christmas holidays. It was planned that he would stay from December 22, 2001 through December 26th or 27th. On December 22, Whiting brought Christina to Krassner's hotel in Canada, along with her birth certificate and everything he would need to care for Christina over the next four days. The parties agreed that Whiting was to pick Christina up on Christmas day so that Christina could spend Christmas with Whiting's family at the home of Whiting's mother.

At approximately 4:00 P.M. on December 24, Whiting called Krassner to check in on Christina and was told that she was in New York with her father. He had taken her there without Whiting's consent apparently in response to a concern he had regarding Whiting's attentiveness to Christina's needs. Whiting immediately called the police in Canada, who arrived and discovered, upon investigation, that Krassner had checked out of his hotel at 4:30 in the morning on Christmas Eve. Both parties then initiated legal proceedings in their respective countries and Whiting filed this petition under The Hague

---

if they had remained in the U.S. because she would not have been able to support her.

Convention for the return of Christina. After an expedited hearing, the District Court found that Christina was a resident of Canada and that her removal was wrongful under Canadian law. In reaching this conclusion, the District Court focused on the Agreement and reasoned that, although the parties had agreed that Christina should return to the United States if certain conditions were met, there was no mutual agreement that she would be returned to New York. The Court, therefore, ordered her return to Canada. The District Court also ordered Krassner to pay Whiting's attorneys fees and costs pursuant to 42 U.S.C. § 11601 et seq. in the amount of $46,441.68. Krassner sought a stay of the order to return, but this was denied. On January 29, 2003, he then filed a motion for expedited appeal from this Court and on January 30, 2003, he sought a stay from this Court; both were denied. Christina was returned to Canada on February 5, 2003. Krassner's trial counsel ceased to represent him and Krassner then filed an *in forma pauperis* affidavit and request to reopen his appeal . On July 10, 2003, we granted his motion to reopen the appeal and, on July 25, 2003, granted his motion for appointment of counsel. We also specifically directed the parties to address "whether this appeal is moot, given the fact that Christina Krassner has been returned to Canada."

II. Mootness

On appeal, the parties have addressed the question of mootness. Krassner argues that an appeal from a decision under The Hague Convention is not moot simply because the child had

-6-

been returned to the custody of the petitioner at the time of the appeal. While Whiting agrees with Krassner's position concerning the issue of mootness, she contends that he is judicially estopped from asserting this position because he took a contrary position in his arguments to the District Court and to this Court as part of his initial motion for expedited appeal. For the reasons set forth below, we hold that Krassner is not judicially estopped from arguing against the mootness of his appeal; we also agree with the parties that the appeal is not moot simply because Christina had been returned to petitioner at the time of the appeal.

## A. Judicial Estoppel

In an interesting twist, Whiting contends that while the appeal, itself, is not moot, Krassner should be estopped from arguing that it is not moot under the doctrine of judicial estoppel. Essentially, she argues that because Krassner argued both before the District Court and initially before this Court that his appeal would be rendered moot if Christina were returned to Canada, he should be prohibited from advancing the position that his appeal was not rendered moot when her return occurred. We find this argument to be unavailing.

Judicial estoppel prevents parties from taking different positions on matters in litigation to gain advantage. United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999). Here, we question whether Krassner's having argued for a stay based on the likelihood that his claim could be held to be moot is the type

-7-

of "position" that should work an estoppel. Should he be forced to forego an argument that this legal result could follow, or else risk that his later opposition to this result would be barred? We think not. Additionally, and importantly, Krassner did not advocate this position in bad faith, which we have held to be an essential requirement for the application of judicial estoppel. See Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 777 (3d Cir. 2001). We have observed that "[j]udicial estoppel may be invoked by a court at its discretion to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions..." Motley v. New Jersey State Police, 196 F.3d 160, 163 (3d Cir. 1999) (citations and quotations omitted). Here, where a panel of this Court specifically asked Krassner to address the mootness issue, where his prior contentions as to mootness were more predictive than assertive, and where Krassner was not "playing fast and loose" with the Court, judicial estoppel simply does not fit.

Further, there is an exception to the general concept of "judicial estoppel" when it comes to jurisdictional facts or positions, such that it has been said that "judicial estoppel... cannot conclusively establish jurisdictional facts." In re Southwestern Bell Tel. Co., 535 F.2d 859, 861 (5th Cir. 1976). Mootness must be examined by the court on its own and courts have generally refused to resort to principles of judicial estoppel to prevent a party from "switching sides" on the issue of jurisdiction. See Da Silva v. Kinsho Internat'l Corp., 229 F.3d 358 (2d Cir. 2000); see also Fahnestock v. Reeder, No. 00-CV-1912, 2002 U.S. Dist. LEXIS 11292, at *4 n.2 (E.D. Pa. Jan. 28, 2002) (*vacated on other grounds*). Therefore, we find that

Krassner is not judicially estopped from asserting that the case remains a live case or controversy and we now turn to the question of mootness.

## B.  Mootness of the Appeal

Krassner and Whiting have brought to our attention the opinions of other courts of appeals that have adopted opposing views as to whether an appeal from a decision under The Hague Convention is rendered moot if the child has been returned to the country from which she was removed during the pendency of the appeal.  Under Article III of the Constitution, this Court has "no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"  Church of Scientology v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)).  Accordingly, although the parties urge that the appeal is not moot, we must still decide this issue to assure the existence of our jurisdiction.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).

In undertaking the mootness inquiry, we must consider "whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief ."  Jersey Cent. Power & Light Co. v. New Jersey, 772 F.2d 35, 39 (3d Cir. 1985).  Does Krassner's compliance with the District Court's order to give Christina back to Whiting and Whiting's subsequent return to Canada

with their daughter make it impossible for us to grant any meaningful relief in this case? We hold it does not.

Two courts of appeals have dealt squarely with the issue of mootness of an appeal under The Hague Convention once a child has been returned to the country from which he or she was allegedly wrongfully removed; they have come to differing conclusions on the issue. In <u>Bekier v. Bekier</u>, 248 F.3d 1051 (11th Cir. 2001), the Court of Appeals for the Eleventh Circuit held that an appeal from a district court order directing the return of a child to his father in Israel under The Hague Convention was rendered moot by the child's return there during the pendency of the appeal. The district court in that case had issued a stay, ordering the child to remain in the United States if an appeal was filed by the child's mother and if the mother posted a $100,000 bond. <u>Id.</u> at 1053. The mother filed the appeal, but failed to post the required bond and, thus, the child was returned to his father. The court of appeals held that because the child's father had received the initial relief he sought in his Hague Convention petition, the case was moot.

In reaching this conclusion, the court relied on cases in which the actions of the lower court simply could not be undone by the appellate court or in which the appellant had already received the relief he or she was seeking during the pendency of the appeal. <u>See, e.g.,</u> <u>B&B Chem. Co., Inc. v. E.P.A.</u>, 806 F.2d 987, 989 (11th Cir. 1986) (dismissing challenge to a warrant execution as moot because warrant had already been executed); <u>Brown v. Orange County Dep't of Doc. Serv.</u>, No. 94-56274, U.S. App. LEXIS, 15921 (9th Cir. July 1, 1996) (unpublished) (dismissing as moot an appeal under The Hague Convention

-10-

where appellant was seeking the child's return to Austria and this return occurred while appeal was being pursued). But these cases are inapposite and should not have been controlling because the return of a child under The Hague Convention is still being contended by the losing party and relief can be afforded. In <u>Bekier</u>, as in this case, notwithstanding the return of the child, the issue as to whether the initial taking was wrongful was still very much alive. We are unconvinced by the <u>Bekier</u> court's reasoning and decline to adopt it. Instead, we will follow the rationale of the other court of appeals weighing in on this precise issue – the Fourth Circuit in <u>Fawcett v. McRoberts</u>, 326 F.3d 491, 495-96 (4th Cir. 2003).[2]

In <u>Fawcett</u>, the district court had granted The Hague Convention petition of the mother and ordered the return of the child from the United States to Scotland and the father then appealed. <u>Id.</u> at 492. The court of appeals reasoned that the appeal was not moot simply because the child had been returned to Scotland because "no law of physics would make it impossible for Ms. Fawcett to comply with an order by the

---

[2] There, the court had the same difficulty as we do with the <u>Bekier</u> court's analysis, and rejected it. The court stated that it was "unclear" why the <u>Bekier</u> court came to the conclusion it did. It hypothesized that perhaps the inability of the court to enforce a contrary order in a foreign court had been at the heart of its view that further relief could not be afforded. <u>See</u> <u>Fawcett</u>, 326 F.3d at 495-96. This does not alter our thinking, as it did not alter the Fourth Circuit's.

district court that she return Travis to the United States. To the contrary, such orders are fully within the district court's power and are commonly issued by courts in the United States." Id. at 496. We find this reasoning to be sound. Nothing has occurred during the pendency of this appeal that makes "it impossible for the court to grant 'any effectual relief whatever.'" Church of Scientology, 506 U.S. at 12. Further, reversal could certainly "affect the matter in issue." Id. In ordering the return of Christina, the District Court would essentially be holding that the removal by Krassner was not wrongful under The Hague Convention. Such a finding would mean that the order assessing fees and costs against Krassner should be vacated and would also have additional, positive implications for Krassner in later custody proceedings in the United States. For these reasons, we hold that the instant appeal is not moot.

## III. Habitual Residence

The main issue presented on this appeal is whether the District Court correctly decided that Canada was Christina's place of habitual residence at the time of the removal. The determination of a child's habitual residence presents a mixed question of fact and law. We, therefore, "review the district court's underlying findings of historical and narrative facts for clear error, but exercise plenary review over the court's application of legal precepts to the facts." Delvoye v. Lee, 329 F.3d 330, 332 (3d Cir. 2003).

The Hague Convention seeks to prevent "the use of force

-12-

to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." Elisa Perez-Vera, Explanatory Report p. 11, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982).[3]     The objective of The Hague Convention is to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed.[4] Hague Convention, pmbl. T.I.A.S. No. 11, 670 at 2.  Therefore, determination of a child's habitual residence immediately before the alleged wrongful removal or retention is a threshold question in deciding a case under The Hague Convention.  See Feder v. Evans-Feder, 63

---

[3] Elisa Perez-Vera was the official Hague Conference Reporter, and her report is generally recognized as "the official history and commentary on the Convention."  Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10,494, 10,503 (1986).  Her full report is available at http://www. hiltonhouse.com/articles/Perez_rpt.txt.

[4]Article 3 of The Hague Convention defines a removal to be wrongful when (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

-13-

F.3d 217, 222 (3d Cir. 1995).

The Hague Convention does not specifically define the term "habitual residence." The inquiry into a child's habitual residence is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case. See In Re Bates, No. CA 122-89 (*available at* http://www.hiltonhouse.com/cases/Bates_uk.txt), High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989) (unreported) (stating that courts should "resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or pre-suppositions").

We were first presented with the opportunity to determine the contours of a child's habitual residency under The Hague Convention in Feder. There, two parents lived in Pennsylvania with their four-year-old son, Evan, for approximately four years before moving to Australia as a result of the father's job prospects. Although the mother had reservations about living in Australia, she acquiesced to the move and even enrolled Evan in kindergarten, which was not to begin for a year after the move. Additionally, the family bought a house in Australia, Mrs. Feder auditioned for and accepted a role with the Australian Opera Company, Mrs. Feder applied to have Evan admitted to a private school in Australia when he reached fifth grade, and the entire family obtained Australian Medical cards. See Feder, 63 F.3d at 219. Less than a year after their move to Australia, Mrs. Feder left the country with their son and returned

-14-

to the United States. Although she had told her husband the reason for the trip was to visit her family, she actually intended to move back to Pennsylvania with Evan permanently.

Mr. Feder eventually brought a proceeding for wrongful removal and retention of their son under The Hague Convention. The district court concluded that Evan's place of habitual residence at the time of the trip back to Pennsylvania was the United States and, therefore, his removal and retention were not wrongful. On appeal, we reversed, finding that Evan's habitual residence was Australia because it was the place where he had been physically present for an amount of time sufficient for him to become acclimatized, and which had a degree of settled purpose from the child's perspective. Id. at 224. In reaching this conclusion, we further noted that "a determination of whether any particular place satisfied this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Id.

In defining habitual residence in Feder, we found the court's reasoning in the British case of In Re Bates to be instructive[5]. There, the court stated that in deciding whether a

---

[5]That case required the determination of the habitual residence of a two and one-half-year-old girl, whose father was a musician and traveled extensively. Mother and daughter had toured with the father for the majority of the girl's life to that point. While London was the family's home base, the daughter had spent most of her life traveling from country to country.

place constitutes a child's habitual residence:

> There must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode.... All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled. Id. at 223.

Since our decision in Feder, we have examined the issue of a child's habitual residence for purposes of The Hague Convention on another occasion. In Delvoye v. Lee, we were

--------

The parents finally decided that the mother and daughter would live in New York City while the father toured the Far East. After the father had been gone for only two days, he ordered the nanny to bring the girl to London. The mother filed a petition for her return under The Hague Convention and the question before the court was whether New York was the daughter's habitual residence. The court looked to the parents' intentions to have the mother and child reside in New York and held that New York was, indeed, her habitual residence.

required to determine an infant's place of habitual residency. In that case, the mother and father met in New York in early 2000. The father lived in Belgium, but eventually moved to New York in September 2000 to live with the mother. The mother then learned she was pregnant and began prenatal care in New York. Eventually, however, she agreed to deliver the baby in Belgium because she could obtain free medical care there. She traveled to Belgium on a three-month visa, and took only her maternity clothes. She lived out of her suitcase the entire time and returned to New York two months after the baby was born. The father then filed a petition for return of the child under The Hague Convention. The district court ruled that the father had not proved that the baby was a habitual resident of Belgium and, thus, had not met his burden of proof. He appealed and we affirmed the district court. Delvoye v. Lee, 329 F.3d at 332, 334.

We concluded that because the mother had retained her ties to New York, had not taken most of her belongings with her to Belgium, was in Belgium on only a three-month visa and lived out of a suitcase there, there did not exist the degree of common purpose to habitually reside in Belgium. Id. at 334. We focused on the intentions of the parents as indicative of the child's habitual residence, noting that "'[w]here a child is very young it would, under ordinary circumstances, be very difficult for him . . . to have the capability or intention to acquire a separate habitual residence.'" Id. at 333 (quoting PAUL BEAUMONT & MCELEAVY, THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION 91 (1999)). We stated that because the parents lacked the "shared intentions" concerning their child's presence in Belgium, the child was not a habitual

-17-

resident of Belgium.  Id.  Taken together, Delvoye and Feder demonstrate the importance of a shared parental intent in deciding the issue of habitual residence of a child lacking the capacity to form his or her own intentions concerning residency.

Other courts have examined the issue of habitual residence under The Hague Convention using varying formulations, with varying results.  This is to be expected since the inquiry into a child's habitual residence is, as we stated earlier in our discussion, necessarily fact-intensive and circumstantially based.  In a recent and comprehensive opinion, the Court of Appeals for the Ninth Circuit examined this issue in the context of four children who moved to the United States with their mother after living in Israel for their entire lives. They originally moved to the United States with their father's consent that they would remain there for fifteen months.  One year after moving to Los Angeles with the children, the mother filed a petition for dissolution of her marriage and to gain custody of the children.  The father then filed a petition seeking to have the children returned to Israel under The Hague Convention.  Mozes v. Mozes, 239 F.3d 1067, 1069 (9th Cir. 2001).

In the opinion, the Ninth Circuit took the opportunity to more clearly define the term "habitual residence."  The court explained that, in its view, "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind."  Mozes at 1075.  The court went on to declare that the intentions that should be examined are those not of the child, but rather of "the person or persons entitled to fix the place of the child's residence." Id. at 1076.  We are in agreement

-18-

with the Ninth Circuit on this point, at least when the child whose habitual residence is being determined is of such a young age that he or she cannot possibly decide the issue of residency for himself or herself. For, as we noted in Feder, determination of habitual residence requires analysis of "the parents' present, shared intentions regarding their child's presence." Feder, 63 F.3d at 224. In that opinion, we also quoted the court in In Re Bates for the proposition that "'in the case of a child as young as Tatjana [who was two and one-half years old at the time of her abduction], the conduct and the overtly stated intentions and agreements of the parents during the period preceding the act of abduction are bound to be important factors and it would be unrealistic to exclude them.'" See Feder, 63 F.3d at 223.

The Ninth Circuit then went on to delineate three broad categories of fact patterns that arise in cases under The Hague Convention in which parents are contesting where the child habitually resides. The first of these is the situation in which the court finds that the family as a unit has translocated and "manifested a settled purpose to change its habitual residence, despite the fact that one parent may have had qualms about the move." Mozes, 239 F.3d at 1076. This usually leads courts to find a change of habitual residence. Secondly, there are cases where the petitioning parent initially agreed to allow the child to stay abroad for an indefinite duration. These cases, the court declared, generally have no clear answer and are very fact-dependent. Id. at 1077. Finally, there are cases, like ours, where the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration. The court noted that in these types of cases, most courts will find no change in habitual residence. However, the court went on to

-19-

point out that a child may become habitually resident even in a place where he or she was intended to live only for a limited time if the child's original habitual residence has been effectively abandoned by the shared intent of the parents. Id. at 1082.[6]

This caveat regarding shared intent brings the Ninth Circuit's decision into alignment with our reasoning in Feder and Delvoye. For, as stated earlier, Feder requires only a degree of settled purpose to accompany the move, even if such purpose is only for a limited period. Feder, 63 F.3d at 223. Such is the case before us. Unlike many cases arising under the Hague Convention, the parents' intent in this case is embodied in the Agreement and, therefore, need not be inferred from their actions. The District Court found that the Agreement specifically stated that Whiting and Christina would reside in Wallaceburg, Ontario, Canada, and Christina would return to the

---

[6] Krassner agrees that this case falls into this category of cases as described by the Mozes court. (Appellant's Brief at 38.) However, he has failed to recognize that while the court in Mozes did state that most of these cases will result in a determination that habitual residence has not changed, the court then went on to make an exception for cases where the move, albeit for a limited time, is an effectuation of the shared intent of the parents. Therefore, although we agree with Krassner that when classified in the terms of the Mozes court, this case would be one of intent to move for a limited period, we do not agree that such a finding necessitates the conclusion that this could not work a change in habitual residence.

United States no later than October 19, 2003, depending upon certain conditions. (App at 5, 57.) Thus, we have a shared intent by Christina's parents that she live in Canada for a period of two years. This fulfills the requirement set out by this Court in Feder that Whiting and Christina's move to Canada was accompanied by a degree of settled purpose.

Krassner further contends that Canada cannot be considered Christina's place of habitual residence because there was never an intent to abandon New York as her habitual residence. At the outset, we note that while our jurisprudence on habitual residency, unlike that of the Ninth Circuit, has not heretofore enunciated a need for an intent to abandon a former habitual residency in order to establish a new one, it does seem implicit in the concept of acquiring a new "habitual" residence that the previous "habitual" residence has been left behind or discarded. To the extent that consideration of "intent to abandon" informs our basic inquiry and helps to elucidate the precise contours of parties' mutual understanding, we believe it to be a useful test. In this case, we do find an intent to abandon New York for a definite and extended period in the life of an infant. For the fact that Whiting and Christina were to return to the United States, subject to certain conditions, does not in any way diminish the parties' settled intention that the two were to remain in Canada for at least two years.[7] Furthermore,

---

[7] And, the return of Christina to the state of New York was never specifically agreed upon. While it seems clear that Krassner intended to stay in the New York area, he was living in an apartment in New Jersey at the time of the proceedings.

the fact that the agreed-upon stay was of a limited duration in no way hinders the finding of a change in habitual residence. Rather, as we stated in <u>Feder</u>, the parties' settled purpose in moving may be for a limited period of time. <u>See</u> <u>Feder</u>, 63 F.3d at 223. Logic does not prevent us from finding that the shared intent of parents' to move their eighteen-month old daughter to Canada for two years could result in the abandonment of the daughter's prior place of habitual residence. Put more succinctly, in our view, the intent to abandon, need not be forever; rather, intent to abandon a former place of residency of a one year old child for at least two years certainly can effectuate an abandonment of that former habitual residence.

Our review of the caselaw concerning the definition of "habitual residence" under The Hague Convention leaves us convinced that the framework we established in <u>Feder</u> and further cemented in <u>Delvoye</u> continues to provide the best guidance for determining a child's habitual residency. In <u>Feder</u>, we stated that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose from the child's perspective.'" <u>Feder</u>, 63 F.3d at 224. However, we went on to modify this requirement both in <u>Feder</u>, itself, and later in <u>Delvoye</u> when the situation involves a very young child. In these circumstances, we recognized that the shared intent of the parents in determining the residence of their children was of paramount importance. <u>See</u> <u>Feder</u>, 63 F.3d at 223; <u>see</u> <u>Delvoye</u>, 329 F.3d at 333-34.

Today, we further attempt to clarify the definition of habitual residence when the child involved is very young. In

-22-

such a case, acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence. In recognizing acclimatization as an element of habitual residency in Feder, we were attempting to develop a definition of habitual residence which would comport with one of the main objectives of The Hague Convention- i.e., restoring the child to the status quo before the abduction. We recognize that this goal is crucial when the child involved is not only cognizant of his or her surroundings, but also of an age at which it is able to develop a certain routine and acquire a sense of environmental normalcy. A four-year- old child, such as Evan Feder, certainly has this ability. A child of such age is not only aware of those around him, but is able to form meaningful connections with the people and places he encounters each day. A very young child, such as Christina, does not have such capability. Therefore, her degree of acclimatization in Canada is not nearly as important to our determination of habitual residence as are her parents' shared intentions as to where she would live during her formative years.

Focusing on the settled purpose to establish a habitual residence from the parents' perspective in the case of a young child not only provides us with a more workable framework in this context, but also furthers another objective of The Hague Convention– the deterrence of child abduction. For if we were to focus on whether a child of Christina's age has been acclimatized to her new surroundings at the time of her abduction, this would provide a perverse incentive to any parent contemplating an abduction to take the child as early as possible in a new environment. While we realize that this incentive

-23-

problem persists regardless of the age of the child, we believe that the acclimatization element is still important for courts to focus on when determining the habitual residence of an older child in order to prevent such child's environmental normalcy from being disrupted.

When we apply the analysis above to the facts at hand, it becomes clear that Canada was Christina's place of habitual residence immediately before she was taken by her father. For the shared intent of her parents, as clearly evidenced in the Agreement, was that she would remain in Canada for at least two years. It is clear that when Krassner removed Christina from Canada and took her to the United States, his acts were disruptive of an agreed-upon intention. This is exactly the type of settled purpose we contemplated in Feder. Therefore, we hold that the District Court was correct in finding that Christina's place of habitual residence at the time of her abduction was Canada.

Accordingly, the order of the District Court will be affirmed.