COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, O'Brien and Malveaux
Argued at Richmond, Virginia


KEVIN COE

                                                            OPINION BY
v.        Record No. 0854-15-4                    JUDGE ROBERT J. HUMPHREYS
                                                            JULY 26, 2016
SEON HWA COE


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

John Crouch (Crouch & Crouch PLLC, on briefs), for appellant.

Soyoung Lee (Lee & Meier, PLLC, on briefs), for appellee.


Kevin Coe ("father") appeals the ruling of the Circuit Court of Arlington County (the

"circuit court") returning the parties' child ("J.C.") to the Republic of Korea ("Korea") pursuant

to the Hague Convention on Civil Aspects of International Child Abduction ("the Convention")

and the award of legal fees, costs, and travel expenses associated with the case to Seon Hwa Coe

("mother").  Father alleges nine assignments of error.  However, because many of them are

repetitious, we analyze his assignments of error by grouping them into the following five basic

issues:  1) whether the circuit court erred in finding Korea to be J.C.'s habitual residence;

2) whether the circuit court erred in finding that father breached mother's right of custody and

that his retention of J.C. was therefore "wrongful" within the meaning of the Convention;

3) whether the circuit court erred in finding that father failed to prove by clear and convincing

evidence that J.C. has been abused, sexually or otherwise, while in mother's custody in Korea so

that returning J.C. to Korea would pose a grave risk as understood within the meaning of Article

13(b) of the Convention; 4) whether the circuit court erred in making an award of fees and costs

to mother pursuant to 42 U.S.C. § 11607(b) of the International Child Abduction Remedies Act ("ICARA"); and 5) whether the circuit court erred in entering a final order without providing father an opportunity to object.[1]

## I. BACKGROUND

Father and mother were married on June 15, 2004 in Arizona. J.C. was born on June 9, 2007.[2] The family lived in Arizona until 2011, when father deployed to Afghanistan as a civilian military contractor. Deciding not to remain in Arizona during father's deployment, mother moved to Korea with J.C. On March 1, 2012, father filed a Petition for Dissolution of Marriage Without Minor Children in the Superior Court of Arizona, Maricopa County. On November 5, 2012, the Superior Court of Arizona, Maricopa County, entered a divorce decree, but it did not make a child custody determination. As of this writing, a child custody determination has never been made by any court. After returning from Afghanistan, father returned to the United States and settled in Virginia. Mother and J.C. remained in Korea until December 2014.[3]

On November 30, 2014, father purchased and sent two round-trip airplane tickets to mother in order for mother and J.C. to visit him in Virginia.[4] On December 12, 2014, mother and J.C. arrived in Virginia through Dulles International Airport. Father picked the pair up from

---

[1]After the circuit court made its ruling and the parties filed their respective appellate briefs, ICARA was recodified within the United States Code to 22 U.S.C. §§ 9001-9011. Specifically, 42 U.S.C. § 11607(b) is now 22 U.S.C. § 9007(b).

[2] Father is a citizen of the United States. Mother and J.C. are dual citizens of both the United States and Korea.

[3] After moving to Korea in 2011, the only occasion prior to December 2014 that mother and J.C. left Korea was during a 2011 vacation to Phuket, Thailand with father.

[4] Mother and J.C. were scheduled to return to Korea on January 24, 2015 because J.C.'s Korean primary school commenced on January 27, 2015.

the airport and took them to the home of Bonnie Coe ("Bonnie"), father's mother/J.C.'s paternal grandmother, in Stafford, Virginia.

On the way to Bonnie's home, father told mother that they were stopping at Target to pick up some necessary items. After arriving in the Target parking lot, father told mother to go inside the store while he stayed in the car with J.C., who was asleep. Shortly after arriving at Bonnie's home, mother, while unpacking her luggage, discovered that both of J.C.'s passports were missing.[5] Father admitted to taking the passports while mother was inside Target and refused to return them.

On December 14, 2014, father and his girlfriend took J.C. from Bonnie's home without mother's consent. Father testified that while at a Build-A-Bear store, J.C. refused multiple times to use the restroom and that she urinated on herself during the visit. Father then took J.C. to stay with him and his girlfriend at their apartment in Arlington, Virginia. From this point forward, father denied mother access to J.C. After a couple of weeks, father emailed other to inform her that she had an airplane ticket for her return to Korea.

Father testified that J.C. expressed to his girlfriend that J.C. had knowledge of oral sex and was being abused in Korea. Further, he testified that J.C. told him that her Korean uncle had touched her private area. Father hired a child psychologist, Theresa Schill ("Schill"), to meet with J.C. During a session with Schill, J.C. played with dolls and made them touch genitalia. Schill testified that J.C.'s behavior "would not be necessarily developmentally [age] appropriate." However, Schill admitted that it was "outside the scope" of her expertise to know if J.C. had been sexually abused. Subsequently, father hired Dr. Stanley E. Samenow

---

[5] Due to J.C.'s dual-citizenship status she carries two passports—one American and one Korean. For safekeeping, the passports were kept in separate locations within mother's luggage.

("Dr. Samenow"), a child psychologist, to interview J.C. regarding possible sexual abuse in Korea.

Procedural History

On January 27, 2015, the Juvenile and Domestic Relations District Court for Arlington County ("the JDR court") denied mother's emergency petition for return of J.C. to her "country of habitual residence" pursuant to the Convention. The JDR court held that the petition was premature because the parties had planned for J.C. to stay in the United States for six weeks and that six weeks' time period had not yet run. Father filed an emergency petition for custody, but the JDR court denied it for lack of jurisdiction. Both parties appealed to the circuit court.

On March 12, 2015, the circuit court held its first evidentiary hearing. The circuit court entered an order finding J.C.'s country of habitual residence, within the meaning of the Convention, to be Korea. Additionally, it held that father had "wrongfully removed or retained" J.C. within the meaning of the Convention, as implemented by ICARA. The circuit court was unable to come to a determination regarding the allegation of sexual abuse in Korea. The circuit court appointed a psychological forensic expert, Dr. Samenow, and ordered him to conduct a thorough investigation of the allegations of sexual abuse in Korea in order for the circuit court to determine whether the grave risk exception under Article 13(b) of the Convention applied.[6]

On April 2, 2015, the circuit court held the second evidentiary hearing for the express and limited purpose of hearing Dr. Samenow's report. Dr. Samenow testified that he did not find any evidence of abuse. On April 27, 2015, the circuit court entered an order accepting Dr. Samenow's testimony and report. The circuit court found J.C.'s habitual residence to be Korea and ordered J.C. to be returned to Korea under the custody of mother. Additionally, it

---

[6] Dr. Samenow, the court-appointed psychological forensic expert, is the same child psychologist hired by father before the first evidentiary hearing to evaluate J.C.

found that father failed to overcome his burden to prove by clear and convincing evidence that J.C. had been abused, sexually or otherwise, while in mother's custody in Korea so that returning J.C. to Korea would pose a grave risk of exposing J.C. to physical or psychological harm within the meaning of Article 13(b) of the Convention.

Further, the circuit court ordered, pursuant to 42 U.S.C. § 11607(b) (presently 22 U.S.C. § 9007(b)), that father pay a total of $29,955.37 for necessary expenses incurred by mother during the course of the proceeding. The circuit court found the incurred necessary expenses to be: 1) $26,668 for legal fees and costs; 2) $800 in interpreter fees; 3) $300 for visitation exchange supervisor fees; and 4) $2,187.37 in transportation costs related to the return of J.C. Notably, the circuit court added findings by handwritten signed notation to the final order that "[i]t further appearing to the [circuit] court that based upon the evidence presented, there was manipulation, misrepresentation, and fabrication by [father] regarding allegations of sexual abuse, further justifying the decisions herein, including an award of fees and costs." On May 29, 2015, father filed his written objections to the final order.

II. ANALYSIS

A. Standard of Review

"In an action pursuant to ICARA and the Hague Convention, [the appellate court] review[s] the district court's findings of fact for clear error, while its conclusions regarding principles of domestic, foreign, and international law are reviewed by us *de novo*." Miller v. Miller, 240 F.3d 392, 399 (4th Cir. 2001). "'Clear error' is a term of art derived from Rule 52(a) of the Federal Rules of Civil Procedure, and applies when reviewing questions of fact" in the federal system. Ornelas v. United States, 517 U.S. 690, 694 n.3 (1996). In Virginia, questions of fact are binding on appeal unless "plainly wrong." Quantum Dev. Co. v. Luckett, 242 Va. 159, 161, 409 S.E.2d 121, 122 (1991).

- 5 -

B.  Preservation of Assignments of Error:  Rule 5A:18

Rule 5A:18 makes clear that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling."  "A basic principle of appellate review is that, with few exceptions . . . arguments made for the first time on appeal will not be considered."  Martin v. Ziherl, 269 Va. 35, 39, 607 S.E.2d 367, 368 (2005).  The purpose of the rule "is that the trial judge may be informed of the precise points of objection in the minds of counsel so that it may be advised and rule intelligently."  Ross v. Schnieder, 181 Va. 931, 941, 27 S.E.2d 154, 158 (1943).  Additionally, "an appellate court's review of the case is limited to the record on appeal."  Wilkins v. Commonwealth, 64 Va. App. 711, 717, 771 S.E.2d 705, 708 (2015).

It is well settled in Virginia that pursuant to Rule 1:1, "final judgments . . . remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer."  In Super Fresh Food Mkts. of Va. v. Ruffin, 263 Va. 555, 561 S.E.2d 734 (2002), the Supreme Court of Virginia provided a very clear outline of Rule 1:1.  The Court held that "[t]he running of the twenty-one day time period prescribed by Rule 1:1 may be interrupted only by the entry, within the twenty-one day time period, of an order modifying, vacating, or suspending the final judgment order."  Id. at 560, 561 S.E.2d at 737.  "In the absence of such an express order, the twenty-one day time period is not interrupted, and the case will no longer be under the control of the trial court when the original twenty-one day time period has run."  Id. at 562, 561 S.E.2d at 738.

In the case at bar, father contends he preserved five of his nine assignments of error when he filed his "Respondent's Objections to Final Order."[7] However, when father filed his objections to the final order on May 29, 2015 more than twenty-one days had passed since the final order was entered on April 27, 2015. Therefore, pursuant to Rule 1:1, the circuit court no longer had jurisdiction over the case at the time father filed his objections. Father did not present the circuit court with an opportunity to intelligently rule on his objections; thus, his arguments with respect to these assignments of error were not preserved for appellate review under Rule 5A:18.[8]

There are four remaining issues that were preserved in the circuit court for appellate review: 1) whether the circuit court erred in determining that father violated mother's custody rights; 2) whether the circuit court erred in finding J.C.'s habitual residence to be the Republic of Korea; 3) whether the circuit court erred in awarding mother fees and costs pursuant to 42 U.S.C. § 11607(b) (presently 22 U.S.C. § 9007(b)); and 4) whether the circuit court erred by entering a final order without providing father an opportunity to object.

---

[7] These assignments of error are as follows: 1) the circuit court erred in finding no grave risk or physical or psychological harm to J.C.; 2) the circuit court erred in finding an unspoken message in the expert witness' testimony which it used as an aggravating factor justifying the award of fees and costs; 3) the circuit court erred in accepting mother's last-minute explanation for J.C.'s familiarity with sexual practices; 4) the circuit court erred in refusing to allow time to verify or proffer evidence to disprove the expert witness' statements at the second evidentiary hearing; and 5) the circuit court erred in finding father at fault and "manipulative" for seeking therapy and forensic evaluation for apparent sexual abuse with regard to J.C.

[8] Additionally, of the assigned errors that were also procedurally defaulted under Rule 5A:18, father failed to provide any legal authority pursuant to Rule 5A:20(e) for the allegations that the circuit court erred in 1) finding no grave risk of physical or psychological harm to the child, 2) accepting mother's explanation for J.C.'s familiarity with sexual practices, 3) failing to allow father's counsel to present or proffer evidence to disprove the expert witness, and 4) finding father at fault for raising issues of abuse.

C.  Failure to Provide Legal Support:  Rule 5A:20

Although his assigned error that the circuit court improperly ruled that father's retention of J.C. violated mother's custody rights and constituted a wrongful removal was preserved in the circuit court, father has waived any appellate consideration of this issue through his failure to provide any legal support for his position as required by Rule 5A:20(e).  As this Court has previously stated in Fadness v. Fadness, 52 Va. App. 833, 850, 667 S.E.2d 857, 865 (2008) (quoting Jones v. Commonwealth, 51 Va. App. 730, 734, 660 S.E.2d 343, 345 (2008)), "Rule 5A:20(e) requires that an appellant's opening brief contain [t]he principles of law, the argument, and the authorities relating to each question presented.  Unsupported assertions of error do not merit appellate consideration."  "[W]hen a party's failure to strictly adhere to the requirements of Rule 5A:20(e) is significant, 'the Court of Appeals may . . . treat a question presented as waived.'"  Id. at 850, 667 S.E.2d at 866 (quoting Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008)).

In this case, father utilized the "throw everything at the wall and hope something sticks" approach to appellate advocacy that this Court condemned in Fadness.  52 Va. App. at 850-51, 667 S.E.2d at 866.  As in Fadness, this tactic "is as unappreciated as it is ineffective."  Id. at 851, 667 S.E.2d at 866.  The appellate courts of this Commonwealth "are not unlit rooms where attorneys may wander blindly about, hoping to stumble upon a reversible error."  Id.  When a party believes the circuit court erred, it is the duty of that party "to present that error to us with legal authority to support their contention."  Id.  We hold that because father failed to do so, and because that failure is significant, he has waived his right to have this Court decide whether the circuit court improperly ruled that father's retention of J.C. violated mother's custody rights and constituted a wrongful removal.

Three issues now remain before us. First, we must consider whether the circuit court erred in finding J.C.'s habitual residence to be Korea. Second, we must determine if the circuit court erred in entering a final order without providing father an opportunity to object. Finally, we address whether the circuit court erred in making an award of fees and costs to mother pursuant to 42 U.S.C. § 11607(b) (presently 22 U.S.C. § 9007(b)).

## D. Habitual Residence

The question of J.C.'s habitual residence immediately prior to her retention in the United States is the threshold issue this Court must address. Because most Convention cases are filed in federal courts, this issue appears to be one of first impression in the Commonwealth.

In 1988, the United States ratified the Convention, and Congress implemented it through ICARA. 22 U.S.C. §§ 9001-9011. The Convention "reflects a universal concern about the harm done to children by parental kidnapping and a strong desire among the Contracting States to implement an effective deterrent to such behavior."[9] Feder v. Evans-Feder, 63 F.3d 217, 221 (3d Cir. 1995); see also Hague Convention, Preamble; 22 U.S.C. § 9001(a)(1)-(4). A primary objective of the Convention is to "secure the prompt return of children wrongfully removed to or retained in any Contracting State." Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1228 (2014). The Convention "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted."[10] Id.

---

[9] Both the United States and Korea are contracting states to the Convention.

[10] We note that, according to father's brief, he filed for custody in Korea on May 8, 2015, after the circuit court issued its final order and prior to filing his objections to the circuit court's final order or his notice of appeal. Mother argues that by filing for custody in Korea, father has rendered this appeal moot.
    Nothing in the record verifies a child custody filing in Korea. However, the record clearly establishes that at the time of J.C.'s removal a custody dispute had not been initiated in any jurisdiction. Even if a custody dispute had been initiated prior to J.C.'s removal, "[f]or

- 9 -

"If the child in question has been 'wrongfully removed or retained within the meaning of the Convention,' the child shall be 'promptly returned,' unless an exception is applicable." Abbott v. Abbott, 560 U.S. 1, 9 (2010) (quoting 42 U.S.C. § 11601(a)(4) (presently 22 U.S.C. § 9001(a)(4)). The Convention "is designed to restore the factual status quo which is unilaterally altered when a parent abducts a child and aims to protect the legal custody rights of the non-abducting parent." Feder, 63 F.3d at 221. "[T]he cornerstone of the Convention is the mandated return of the child to his or her circumstances prior to the abduction if one parent's removal of the child from or retention in a Contracting State has violated the custody rights of the other, and is, therefore, 'wrongful.'" Id.; see also Hague Convention, Art. 12. Exceptions exist within the framework of the general rule of return. For example, returning the child is not mandatory if "there is a grave risk that [a child's] return would expose the child to physical or

purposes of the Convention, *it is irrelevant whether there is a custody dispute concerning that child pending at the time of removal.*" Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 343 (5th Cir. 2004); see also Hague Convention, Art. 4.

     Moreover, the Convention is applicable to make a determination about the wrongful removal of a child, and a parent only needs to have a right of custody. See Hague Convention, Art. 3(a). We accept the circuit court's finding that J.C. was wrongfully removed and that father violated mother's custody rights because father's assignment of error that he did not violate mother's custody rights and that J.C. was not wrongfully removed is procedurally barred. Even so, the Explanatory Report to the Convention instructs:

> From the Convention's standpoint, the removal of a child by one [parent with custody] without the consent of the other, is . . . wrongful, and this wrongfulness derives . . . from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. . . . [The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future . . . . It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

Explanatory Report, P 71, at 447-48; see also Sealed Appellant, 394 F.3d at 343. Therefore, this case was properly brought pursuant to the Convention and the appeal is not moot.

- 10 -

psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b).[11]

Under Article 3 of the Convention, the removal or retention of a child is "wrongful" where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention . . . .

Hague Convention, Art. 3. For purposes of the Convention, "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence[.]" Hague Convention, Art. 5(a).

Under ICARA, state and federal district courts have concurrent original jurisdiction of actions arising under the Convention. 22 U.S.C. § 9003(a). Any person seeking the return of a child pursuant to the Convention may commence a civil action by filing a petition in a court where the child is located. 22 U.S.C. § 9003(b). The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful under Article 3; the respondent must show by clear and convincing evidence that one of Article 13's exceptions applies to prevent the return. 22 U.S.C. § 9003(e)(1)(A), (2)(A). A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence. Hague Convention, Art. 19; Abbott, 560 U.S. at 9.

---

[11] This exception was unsuccessfully pleaded by father; however, the assignment of error was procedurally defaulted pursuant to Rule 5A:18.

- 11 -

The Convention does not specifically define the term "habitual residence." However, many federal circuits have had the opportunity to do so. The United States Court of Appeals for the Fourth Circuit has concluded that "there is no real distinction between ordinary residence and habitual residence." Miller, 240 F.3d at 400; see also Friedrich v. Friedrich, 983 F.2d 1396, 1398 (6th Cir. 1993) (explaining "[a] person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward."). The analysis is "a fact specific inquiry that should be made on a case-by-case basis." Miller, 240 F.3d at 400. Notably, "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." Id.

In the case at bar, J.C. was born in the United States in the state of Arizona. Father deployed to Afghanistan, and mother returned to her native country of Korea with J.C. Mother and J.C. never returned to the United States until father purchased roundtrip airline tickets for them to visit him in December 2014. Accordingly, the circuit court determined J.C.'s habitual residence to be Korea. On brief, father maintains this finding was error and that the United States is J.C.'s habitual residence because there was never a shared intention of the parties that the child would permanently remain in Korea.

Father cites Whiting v. Krassner, 391 F.3d 540, 550 (3d Cir. 2004), arguing that we should adopt the United States Court of Appeals for the Third Circuit's definition of habitual residence. He argues, pursuant to Whiting, that in the absence of a court order, forming a child's habitual residence requires a "clear shared intent" of the parents coupled with an intent to abandon the existing habitual residence "for a definite and extended period." However, father cherry-picks language from Whiting to favor his cause without regard for the context of the language he cites, and does so without any analysis of its application to the facts of this case.

Whiting involved a petition pursuant to the Convention for the return of an eighteen-month-old child. In short, the parents executed a child custody agreement directly after the September 11, 2001 terrorist attacks on the United States, in which the child was to live with the mother in Canada, but would be returned to the United States "no later than October 19, 2003 as long as there is no imminent danger of constant terrorist attacks." Id. at 542. However, during the father's 2001 Christmas visit with the child in Canada, he checked out of his hotel room at 4:30 in the morning and took the child with him back to the United States without the mother's consent. Id. The definition of habitual residence was the central issue in the case.

First, Whiting reiterated that its previous definition of habitual residence as provided in

> Feder continues to provide the best guidance for determining a child's habitual residency. In Feder, we stated that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose from the child's perspective.'"

Id. at 550 (quoting Feder, 63 F.3d at 224). Then, seeking to clarify its definition of habitual residence when a case involves a very young child, Whiting held that

> in [the case of a very young child], acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence. In recognizing acclimatization as an element of habitual residency in Feder, we were attempting to develop a definition of habitual residence which would comport with one of the main objectives of The Hague Convention - i.e., restoring the child to the status quo before the abduction. We recognize that this goal is crucial when the child involved is not only cognizant of his or her surroundings, but also of an age at which it is able to develop a certain routine and acquire a sense of environmental normalcy. A four-year-old child, such as Evan Feder, certainly has this ability. A child of such age is not only aware of those around him, but is able to form meaningful connections with the people and places he encounters each day.

Id.  The Third Circuit concluded that the eighteen-month-old child did not have the capability to be cognizant of its surroundings such that it had developed a certain routine and acquired a sense of environmental normalcy.  Id. at 551.  "Therefore, [a very young child's] degree of acclimatization . . . is not nearly as important to our determination of habitual residence as are her parents' shared intentions as to where she would live during her formative years."  Id.

Father asks us to selectively adopt the portion of Whiting he cites while he ignores the broader holding in Whiting that for a child over the age of four the previous habitual residence standard remains in place—"a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose from the child's perspective.'"  Id. at 550 (quoting Feder, 63 F.3d at 224).  In the case before us, the record supports the circuit court's conclusion that J.C. was old enough and physically present in Korea long enough to be acclimatized from her perspective to that country.

Accordingly, we hold that the circuit court did not err when it held that mother, as the proponent, met her burden to prove by a preponderance of the evidence that J.C.'s habitual residence is Korea.  Under the Fourth Circuit's Miller standard, which we find persuasive and adopt, there is little doubt that the child's customary residence prior to the removal was Korea—J.C. had lived there since 2011.  Moreover, even under the Third Circuit's Whiting standard, J.C. is over the age of four; hence the place of J.C.'s acclimatization that most closely restores J.C. to the status quo before the abduction is Korea, where, without father's objection, she had lived with mother for the preceding three years and where she was enrolled in primary school.

## E.  Lack of Opportunity to Object

Father states that he raised the issue that he had no notice of an opportunity for him to object before the circuit court entered its final order so that this Court might "consider all the

- 14 -

issues raised in the assignments of error, even if the Court finds that some [errors] are not spelled out." However, the record does not support his contention.

After the second evidentiary hearing, the circuit court asked mother's counsel to prepare the final order. Mother's counsel drafted an order and circulated it to father's counsel, who acknowledged e-mail receipt of the draft order. On April 27, 2015, the circuit court entered its final order with additional handwritten findings.

We conclude that father had a sufficient opportunity to make objections to the final order. He received the draft order on April 14, 2015, and the circuit court did not enter its final order until April 27, 2015. This provided father two weeks prior to entry of the final order to make any objections. Additionally, he could have preserved his objections by filing a motion to reconsider in the circuit court within twenty-one days after entry of the final order. However, by the time father filed his motion on May 29, 2015, the circuit court lacked jurisdiction, pursuant to Rule 1:1, because more than twenty-one days had passed since the entry of the final order.

F. Fees, Costs and Expenses Award

Pursuant to 22 U.S.C. § 9007(b)(3),

> [a]ny court ordering the return of a child pursuant to an action brought under section 22 U.S.C. § 9003 shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . , and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

Father asks this Court to find that the fee award to mother is clearly inappropriate and to vacate such an award.

It is evident from the statute and the relevant case law that an award of fees and costs is ordinarily required and the courts are given broad discretion to enforce compliance with the Convention. It is "the respondent's burden to establish that a fee/expense [award] would be

clearly inappropriate." Whallon v. Lynn, 356 F.3d 138, 140 (1st Cir. 2004). A fee award under the Convention is reviewed for abuse of discretion. Id. An abuse of discretion has been found when a court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." In re Sims, 534 F.3d 117, 132 (2d Cir. 2008). In Virginia, "[a]n award of attorney's fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion." Graves v. Graves, 4 Va. App. 326, 333, 357 S.E.2d 554, 558 (1987). "[T]he key to a proper award of counsel fees [is] . . . reasonableness under all of the circumstances revealed by the record." McGinnis v. McGinnis, 1 Va. App. 272, 277, 338 S.E.2d 159, 162 (1985).

In this case, we find that father failed to meet his burden to show that a fee award would be clearly inappropriate. Father argues that he has "straitened [sic] financial circumstances." However, he never provided any evidence, analysis, or reasoning regarding his inability to pay the award. Rather, father only provided this Court with a bulleted list of cases regarding fee awards. Thus, this Court finds that the circuit court clearly considered all of the evidence in the case and based its decision on the actions of the parties throughout the litigation. In light of all that has taken place, there is nothing unreasonable about the circuit court awarding a fee to mother pursuant to the statute or the amount awarded. Father did nothing to show that the award was clearly inappropriate.

Furthermore, we hold, pursuant to 22 U.S.C. § 9007(b)(3), that father shall pay all of the additional necessary and reasonable expenses incurred by or on behalf of mother in connection with this appeal. Therefore, we remand to the circuit court to determine the amount of additional reasonable and necessary expenses incurred by or on behalf of mother including court costs, legal fees, and transportation costs related to this appeal.

### III. CONCLUSION

For the aforementioned reasons, we conclude that the circuit court did not err in finding that mother met her burden by a preponderance of the evidence to establish that J.C.'s habitual residence is Korea, that father did violate mother's custody rights, that father did have an opportunity to object but failed to do so, and that the award of fees, costs, and expenses was appropriate. All other assigned errors, including father's contention that the grave risk exception applies, were either procedurally defaulted under Rule 5A:18 or waived pursuant to Rule 5A:20. Therefore, the judgment of the circuit court is affirmed, and the case is remanded solely for consideration of an award of reasonable appellate attorney's fees and costs consistent with this opinion.

Affirmed and remanded.