COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Ortiz and Chaney

UNPUBLISHED

AMOS JACOB ARROYO

v.      Record No. 1840-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION*
PER CURIAM
JUNE 11, 2024

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Tyneka L.D. Flythe, Judge

(Charles E. Haden, on brief), for appellant.

(Jason S. Miyares, Attorney General; Suzanne Seidel Richmond,
Assistant Attorney General, on brief), for appellee.


Following a jury trial held in the Circuit Court of the City of Newport News ("trial court"),

Amos Jacob Arroyo ("Arroyo") was convicted on two counts of first-degree murder, two counts of

use of a firearm in the commission of a felony, shooting into an occupied dwelling, two counts of

child abuse or neglect, and burglary, in violation of Code §§ 18.2-32, -53.1, -279, -371.1(B), -90.

Arroyo was subsequently sentenced to three separate terms of life imprisonment plus 28 years of

additional incarceration. Arroyo contends, on appeal, that the trial court erred: 1) by finding that his

statutory speedy trial rights were not violated; 2) by rejecting his proffered jury instructions

regarding involuntary manslaughter, voluntary manslaughter, and heat of passion; and 3) by failing

to find the evidence insufficient in support of his various convictions. After examining the briefs

and record in this case, the panel unanimously holds that oral argument is unnecessary because "the

appeal is wholly without merit." *See* Code § 17.1-403(ii)(a); Rule 5A:27(a). Finding no error in the

trial court's judgment, we affirm his convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

## I. BACKGROUND[1]

A. *Factual Background*

Arroyo and Patricia Joseph ("Joseph") dated between 2010 and 2016. During this period, the couple's two sons, M.A. and P.A., were born. After their separation in 2016, Arroyo and Joseph resided in the same neighborhood, living less than a mile apart from each other. Their children stayed with Joseph and her father, Jesse Barnes ("Barnes"), at their residence during the week while spending weekends with Arroyo at his nearby residence. During the summer of 2017, both Arroyo and Joseph became involved with new romantic partners; Arroyo with Chloe Webb ("Webb") and Joseph with Jonathan Yeamen ("Yeamen"). Arroyo and Joseph's new romantic partner, Yeamen, had met a few times prior to July of 2017.

On July 30, 2017, Yeamen was visiting with Joseph at the home she shared with Barnes. Barnes, M.A., and P.A. were present at the home as well. Yeamen's tan Mercury Mountaineer was parked right outside of the home when, at about 6:00 p.m., Yeamen prepared to leave. Following a knock at the front door, Joseph approached the door, and gunfire erupted from outside with gunshots entering through the front door. Yeamen then ran to the back bedroom of the home and hid in a closet. From the closet, Yeamen heard the front door of the house being opened. He then heard several more gunshots inside the home as well as the assailant's footsteps inside the house. Yeamen was only able to see a portion of the assailant's lower leg, but as the assailant left, Yeamen heard Arroyo's voice assure M.A. that everything is going to be all right. When Yeamen heard the

---

[1] "On appeal, we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

front door finally close and a car speeding away, he ran from the house through the side door into the wooded area behind the home and called 911.[2]

M.A. testified that on July 30, 2017, he was playing in his room while his younger brother, P.A., was in their mother's bedroom. He also testified that his grandfather, Barnes, was out in the living room sitting on the couch. M.A. further noted that his mother's friend "Jay" was in the house as well. He testified that there was a knock at the front door and when M.A. emerged from his room to see who had arrived, he saw his father shoot his mother and his mother fall to the ground. He then attempted to follow Barnes, who was fleeing towards the bathroom on the opposite end of the home. He testified that he stopped following Barnes after he saw his father shoot him. Finally, he testified that when Arroyo was leaving, M.A. asked him "why he . . . did what he just did," and Arroyo replied, "because [your mother and I] fight a lot." After his father left, M.A. stated that he panicked and went to the neighbor's house.

Rogelio Alverez ("Alverez") who lived next to Joseph and Barnes also testified at trial that around 6:00 p.m. on July 30, 2017, he was watching soccer in his living room when he heard gunshots. He initially disregarded the noise because neighborhood kids "had been shooting caps." However, a few minutes later after hearing another series of more than five more gunshots, he became concerned, and while looking out of his kitchen window, he witnessed Arroyo leaving Joseph's home with two guns in his hand before getting into a white Dodge and driving away. Less than five minutes later Alverez saw M.A. exit the home and walk barefoot across broken glass. Alverez then went out the back door of his house and asked M.A. what happened. At Alverez's instruction, M.A. went back and retrieved P.A. from the house. Alverez noted that six-year-old M.A. had "a fixed expression" and that when one-year-old P.A. came out of the house, he "kept looking straight ahead." Alverez believed both children "were in shock."

---

[2] Yeamen's 911 call was played for the jury.

Newport News Master Police Officer D.B. Daniels ("Officer Daniels") and Officers Peterson[3] and Brian Adamson ("Officer Adamson") responded to the scene of the shooting. Recordings from both Officer Daniels's and Officer Adamson's body-worn cameras were played for the jury.[4] Upon arriving, the officers observed broken glass from the front storm door and shell casings on the front porch. The main front door was ajar and had multiple bullet holes in it. When Officer Daniels pushed the front door open, he found Joseph lying inside the doorway.

The officers then found Barnes in the back bathroom. Although Barnes's eyes were open and he appeared alert, he did not respond to the officers' attempts to communicate with him. Barnes was subsequently transferred to a local hospital where he died from multiple gunshot wounds. After determining that the residence was clear of additional assailants, Officer Daniels returned to Joseph to check her for a pulse. Finding no pulse, Joseph was pronounced dead at the scene. While securing the scene, Officer Adamson met M.A. and P.A. M.A. informed Officer Adamson that he and P.A. were in the house at the time of the shooting and that their father, Arroyo, had shot their mother and grandfather.

Arroyo's girlfriend, Webb, testified that on July 30, 2017, she and Arroyo spent the day at the mall, the beach, and the pool. Webb noted that Arroyo drank alcohol consistently throughout the day of July 30 and that "his moods went up and down throughout the day." When the couple returned home in midafternoon, Webb noticed that Arroyo had taken an indirect route to their residence. Shortly after arriving at their shared home, Arroyo left in the vehicle to buy cigarettes.

---

[3] Officer Peterson's first name was never disclosed at trial.

[4] Officer Daniels acknowledged that he did not activate his body-worn camera correctly. Thus, the footage did not show the officers' initial entry into the neighborhood or the home. Instead, the footage began moments after Officer Peterson established the house was clear and found Barnes.

Officer Adamson's body-worn camera footage began at an unrelated traffic stop. During the stop, Officer Adamson learned of the nearby shooting. Officer Adamson abandoned the traffic stop and allowed the stopped driver to go before he responded to the shooting.

Arroyo subsequently returned from buying cigarettes and went into his bedroom and shut the door. Webb testified that she heard Arroyo rummaging in his closet and a sound that she thought was Arroyo opening his safe. Arroyo then emerged from his bedroom and immediately left the residence in his vehicle. Several minutes later, Webb heard sirens, began to worry about Arroyo, and attempted to call him multiple times on his cell phone but he did not answer. Webb did not see Arroyo again that day.

Angela Michelle Nix ("Nix"), a subsequent girlfriend of Arroyo, testified that she began dating Arroyo in the fall of 2017 after meeting him at a thrift store in Texas. After dating for several weeks, Arroyo moved in with Nix and her twin daughters. Nix recalled that in January of 2018, Arroyo informed Nix that he might be wanted in Virginia "for shooting his ex and her dad." At first, Nix did not believe Arroyo, but after running a Google search on her phone, she realized that police were searching for him concerning murders in Virginia. Nix then confronted Arroyo and demanded that he leave her home. Upon Nix's advice, Arroyo left her home and turned himself in at a police station in Texas.

Arroyo testified in his own defense at trial. He said he started drinking upon waking on July 30 and that he continued to drink throughout the day. Arroyo explained that he was depressed, experiencing post-traumatic stress, not sleeping, and contemplating suicide. Sometime during the day, he decided to commit suicide. Arroyo said he took a gun to a fountain in his residential complex to complete the act, but before doing so he thought "she needs to see it." Consequently, Arroyo said that he drove to Joseph's home so that she could witness his suicide. Arroyo admitted that he took his FMK nine-millimeter handgun and another firearm with him to Joseph's home.

Arroyo testified that when he arrived at Joseph's residence, he approached the house with a gun in each hand and knocked on the front door to summon Joseph. Arroyo stated that he heard Joseph approach the front door and simultaneously saw P.A. in the kitchen by himself. Arroyo

- 5 -

claimed that he believed that his one-year-old son was left alone and he "just snapped," and started shooting through the front door. According to Arroyo, when he entered the home Barnes was standing in the threshold of his bedroom with a gun. Arroyo said that he feared Barnes would shoot him, so he shot Barnes first.

Arroyo further claimed that when he went outside after the shootings, "it was like waking up from watching somebody else move and [he] realized what had happened" and he "freak[ed] out." After the killings, Arroyo returned home, retrieved money and a binder containing his various forms of identification, and fled to Georgia where he abandoned his car, his documentation, and firearm in a Walmart parking lot.[5] He continued his flight from law enforcement until he reached Texas where he met and moved in with Nix. Arroyo asserted that he left because he thought his children would be better off with his sister.

On cross-examination, Arroyo admitted that he had a volatile relationship with Joseph, that they often fought, and that he was ready to walk away from his children. Arroyo asserted that he had planned to leave the area and sold some of his possessions in advance of the move. Arroyo acknowledged that he did not have a planned destination and admitted to owning several handguns, including the nine-millimeter FMK that was recovered from his white Dodge, a nine-millimeter Smith & Wesson, and a .40 caliber Smith & Wesson that he left in his safe. He also acknowledged that he endangered his children when he fired 11 rounds through the front door of Joseph's residence.

---

[5] U.S. Marshals contacted Georgia Police Officer John Schmitt ("Officer Schmitt") regarding a white Dodge in the area that was wanted in reference to Joseph's and Barnes's murders. After determining the Dodge had been abandoned, Officer Schmitt secured, towed, and processed it. In the Dodge, Georgia officials recovered an FMK nine-millimeter handgun with a Maxxtech nine-millimeter bullet in the chamber, a cell phone, and a blue vinyl case. Within the vinyl case was the vehicle's Virginia title, Arroyo's birth certificate, Arroyo's Virginia driver's license, and various other cards. Those items, photographs of the vehicle, and various DNA swabs were sent to police in Newport News.

Forensic investigators testified that 20 Maxxtech nine-millimeter cartridges, 1 Winchester .40 caliber Smith & Wesson cartridge casing, and 5 spent bullets were recovered from the scene. In addition, during the autopsies performed on Joseph and Barnes, it was determined that both Joseph and Barnes were shot four times and that two of the bullets found in Joseph's body had been fired from the FMK handgun belonging to Arroyo. Investigators further compared the nine-millimeter FMK handgun Officer Schmitt recovered to the multiple cartridge casings and spent bullets collected from the crime scene. Forensic testing proved that the FMK handgun had fired several rounds, including the two bullets recovered from Joseph's body. However, the FMK was eliminated as to having fired nine of the nine-millimeter casings and one bullet collected from the scene. Forensic investigators also examined a .40 caliber Smith & Wesson gun recovered from Arroyo's home and determined that it had fired at least one casing collected from the scene. Forensic analyst Christopher Luckie ("Luckie") noted that the forensic testing thus indicated that there could have been a third or fourth firearm present and in use at the scene.

At the conclusion of all the evidence, Arroyo argued that the trial court should instruct the jury on voluntary manslaughter and heat of passion as to the killing of both Joseph and Barnes, arguing that the evidence failed to prove malice. He further contended that if the jury accepted his testimony that he lost control after seeing P.A. alone, that would meet the definition of heat of passion. Further, based on Arroyo's testimony that Barnes was armed with a firearm and appeared ready to use it when Arroyo shot Barnes, Arroyo claimed that this could fall "into the [] category of mutual combat," which is "another definition of heat of passion." The Commonwealth asserted that there was no evidence that either Joseph or Barnes provoked Arroyo; thus, the lesser-included offense instructions should not be included related to either victim.

The trial court found that there was no evidence that Joseph provoked Arroyo and rejected the lesser-included instruction as it related to her killing. As to Barnes's killing, however, the trial

court allowed the instruction for voluntary manslaughter, noting Arroyo's testimony that Barnes pointed a gun at him as well as the Commonwealth's evidence of spent cartridges at the home that did not come from Arroyo's firearms. Thus, there was a possibility of a third or fourth firearm at the scene.

After considering the evidence, the jury convicted Arroyo of first-degree murder of Joseph and Barnes, as well as the other charges, and the trial court sentenced him to three life sentences and an additional 28 years of incarceration.

B. *Procedural Background*

Arroyo was incarcerated since his arrest on February 6, 2018. His preliminary hearing was held on September 28, 2018, and the jury trial upon his initial charges was scheduled to commence on January 15, 2019.[6] With respect to the period between January 15, 2019, and February 10, 2020, Arroyo concedes that he consented to the many continuances tolling the statutory speedy trial period.

Next, during a hearing on February 10, 2020, Arroyo moved to proceed *pro se* and presented several motions to the court. Based on Arroyo's written motions and his argument during the hearing, the court opined that Arroyo "need[ed] to have another mental eval." The court left the final determination of the necessity for another mental evaluation to Arroyo's appointed counsel but noted that the "entire proceeding [was] nonsensical and I don't see how he can adequately represent himself in his current mental state, nor . . . assist counsel in his current state." Arroyo's counsel responded to the trial court's suggestion for another mental evaluation, "[t]hat's fine," however, Arroyo stated, "I disagree with that, Your Honor." The trial court subsequently ordered a third

---

[6] In a continuance order on January 10, 2019, the trial court attributed the continuance between the November 13, 2018 docket call and January 15, 2019, to the Commonwealth. The trial court then attributed the continuance from January 15, 2019, until March 5, 2019, to Arroyo.

mental health evaluation to determine Arroyo's competency to stand trial and continued the case until June 8, 2020, for a status hearing to review the ordered mental evaluation.

Beginning on March 16, 2020, the Supreme Court of Virginia declared a judicial emergency, and, in part, tolled the operation of the Speedy Trial Act in the Commonwealth of Virginia due to the COVID-19 pandemic. *See* Order Declaring a Judicial Emergency in Response to COVID-19 Emergency, 1 (Va. Mar. 16, 2020)[7]; *see* EDO of May 1, at 2; *Ali v. Commonwealth*, 75 Va. App. 16, 32 (2022). In the months that followed, the Supreme Court issued additional emergency orders including but not limited to suspending jury trials entirely for a period of about eight weeks. *See* EDO of May 6, at 5 ¶ 12; EDO of June 1, at 2, 5 ¶ 9; EDO of June 22, at 5 ¶¶ 15-16; EDO of July 8, at 1 ¶ 2. The Supreme Court then subsequently directed that jury trials could resume only pursuant to plans submitted by each judicial circuit and approved by the Court. *See* EDO of June 22, at 5-6 ¶¶ 15-16; EDO of July 8, at 1 ¶ 2. Orders impacting and delaying both jury and bench trials in Virginia based on the COVID-19 pandemic were issued periodically until May 27, 2022.

During this period, the trial court in this case granted both numerous joint and defense motions to continue the trial date beginning on June 8, 2020, and through December 9, 2021. In addition, on December 9, 2021, the trial court granted Arroyo's motion to continue the previously scheduled January 2022 jury trial date until September 20, 2022.[8]

---

[7] Additional references in this opinion to the Supreme Court's first order and subsequent related orders are to "emergency order" or "EDO of [date]." *See* EDO of Apr. 22, at 1 (referring to the Supreme Court's first three orders "collectively . . . as the 'Emergency Declaration Orders'"). All cited orders were issued in 2020 and are available on the Legal Information Archive website. *See* https://lipa.access.preservica.com/uncategorized/SO_6ee9ef40-87b3-4973-9e22-aa7123427a02/.

[8] Arroyo's trial date was later changed to September 15, 2022.

For the first time, on December 15, 2021, Arroyo moved to dismiss all of the pending indictments against him on speedy trial grounds. Arroyo contended that the continuance following the February 10, 2020 hearing should count against the Commonwealth for purposes of compliance with the Speedy Trial Act because the delay was caused by the trial court, sua sponte, as a result of ordering a third mental health evaluation. Arroyo reasoned that because he objected to the delay for a third mental health evaluation, that period should count against the Commonwealth and when added to the delay prior to the originally scheduled trial date, the statutory speedy trial clock under Code § 19.2-243 had already run. He also contended that the trial court lacked the authority to order a competency evaluation sua sponte on February 10, 2020, because he had moved to represent himself *pro se*. Thus, he reasoned that the trial court should have conducted a *Faretta*[9] analysis rather than ordering a mental health evaluation. Arroyo maintained that although his court-appointed counsel agreed to the competency evaluation, since he had personally objected to the trial court's decision after having asserted his right to *pro se* representation, the delay should be assessed against the Commonwealth or the trial court. Finally, Arroyo asserted that the trial court should not consider the Supreme Court of Virginia's March 16, 2020 emergency order tolling statutory speedy trial claims because that order was not in effect at the time the trial court ordered the competency evaluation.

The Commonwealth responded that Arroyo's appointed counsel had expressly agreed to the mental health evaluation and the continuance, thus tolling the statutory speedy trial period. The Commonwealth also contended that Arroyo failed to object to the continuance but instead only objected to yet another mental health evaluation thereby consenting to the continuance.

By order entered March 31, 2022, the trial court denied Arroyo's motion to dismiss the indictments on statutory speedy trial grounds, holding that the presiding judge at the February 10,

---

[9] *Faretta v. California*, 422 U.S. 806, 821 (1975).

2020 hearing questioned Arroyo appropriately to determine whether Arroyo should be represented by counsel or represent himself *pro se*. Based on Arroyo's incomprehensible arguments referencing the Uniform Commercial Code and concepts associated with the sovereign citizen ideology, as well as his behavior during the hearing, the trial court determined that it had legitimate concerns about Arroyo's competency to stand trial or to represent himself *pro se* at that time. The trial court also noted that during the February 10, 2020 hearing, Arroyo's appointed counsel agreed with the court that a mental health evaluation was appropriate, stating "[t]hat's fine" in response to the judge's suggestion. Thus, based on Arroyo's court-appointed counsel concurring in the specific period of continuance at issue, as of the date of the letter opinion, the speedy trial period had not yet expired.

II. ANALYSIS

A. *Standard of Review*

"[A] statutory speedy trial challenge presents a mixed question of law and fact." *Young v. Commonwealth*, 297 Va. 443, 450 (2019). The appellate court gives deference to the trial court's factual findings but reviews legal issues de novo, including questions regarding the proper construction of a statute. *Id.*; *see Smith v. Commonwealth*, 282 Va. 449, 454 (2011); *Jacks v. Commonwealth*, 74 Va. App. 783, 788 (2022) (en banc) (applying the de novo standard to the interpretation of statutes and the Supreme Court of Virginia's pandemic emergency orders).

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Holmes v. Commonwealth*, 76 Va. App. 34, 53 (2022) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v.*

*Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

"What the elements of the offense are is a question of law that we review de novo." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Lawlor*, 285 Va. at 223-24. "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Id.* at 224. "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Commonwealth v. McNeal*, 282 Va. 16, 20 (2011)). "In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Id.* (quoting *McNeal*, 282 Va. at 20).

B. *The trial court did not err in dismissing Arroyo's motion to dismiss on speedy trial grounds.*

Arroyo asserts that the trial court erred by denying his motion to dismiss the indictments because his statutory speedy trial rights were violated. On appeal, Arroyo appears to challenge only the delay of trial addressed in the trial court's March 31, 2022 order—namely the period between the February 10, 2020 hearing and the June 8, 2020 hearing. He asserts that 110 days elapsed between his preliminary hearing and his initial jury trial date of January 15, 2019, and that the time counted against the Commonwealth for speedy trial purposes. Conceding that the duration of numerous continuances after that did not count toward the speedy trial timeline, Arroyo maintains that the trial court did not possess the authority to order a mental health evaluation and continue the case generally on February 10, 2020. Arroyo asserts that the ensuing delay effectively postponed

his trial for longer than the remaining 42 days of the speedy trial period defined by Code § 19.2-243. He further asserts that the judicial emergency order entered March 16, 2020, should not toll his statutory speedy trial rights as the trial court had already continued the proceedings from February 10, 2020, until June 8, 2020. We disagree.

Code § 19.2-243 provides specific time limits "within which an accused must be tried, absent tolling or other statutory exceptions." *Brown v. Commonwealth*, 75 Va. App. 388, 406 (2022). Under Code § 19.2-243, a defendant shall be "discharged from prosecution" if no trial is commenced within the specified time period. On September 28, 2018, a preliminary hearing was held, during which the district court found probable cause to believe Arroyo committed a felony. Because he remained incarcerated after the court determined there was probable cause, the statute required Arroyo's trial to commence within five months of the hearing date. *See* Code § 19.2-243. That five-month requirement equates to "152 and a fraction days." *Ballance v. Commonwealth*, 21 Va. App. 1, 6 (1995).

But the five-month period defined by Code § 19.2-243 is "not absolute." *Young*, 297 Va. at 451. "Code § 19.2-243 enumerates seven excusable reasons for the Commonwealth's 'failure to try' the accused within the statutory period." *Wallace v. Commonwealth*, 65 Va. App. 80, 89-90 (2015). In relevant part, the speedy trial period is tolled when delay is caused "[b]y continuance granted on the motion of the accused or his counsel" or "[b]y a natural disaster, civil disorder, or act of God." Code § 19.2-243(4), (7).

As the trial court concluded in its March 31, 2022 order, the record reflects that Arroyo's court-appointed counsel of record agreed to the trial court's order of a competency evaluation on February 10, 2020, and to the necessary delay in the proceedings.[10] Arroyo's attorney said "that's

_____

[10] The trial court's order entered December 17, 2021, reflects that it then set Arroyo's trial to begin on September 15, 2022, with the agreement of the parties, because the number of

- 13 -

fine" when the trial court stated that a mental health evaluation was appropriate. Code § 19.2-243(4) "makes clear that the actions of either 'the accused *or his counsel*' may constitute a waiver of the accused's right to invoke the statute's time limitations." *McCray v. Commonwealth*, 44 Va. App. 334, 342 (2004) (quoting Code § 19.2-243).

In any event, however, 35 days of delay passed between February 10, 2020, and the Virginia Supreme Court's first emergency order tolling speedy trial calculations due to the COVID-19 pandemic. Under Code § 19.2-243(7), the speedy trial limitation did not apply to any period during which "failure to try the accused was caused . . . [b]y a natural disaster." This Court has concluded that the COVID-19 pandemic qualified as a "natural disaster" and thus justified the tolling of statutory speedy trial deadlines as provided in the Supreme Court of Virginia's judicial emergency orders executed between March 16, 2020, and May 27, 2022. *See Ali*, 75 Va. App. at 30; *Brown*, 75 Va. App. at 405-06.

Here, 110 days elapsed between Arroyo's preliminary hearing on September 28, 2018, and the initial trial date on January 15, 2019. As Arroyo acknowledges, the many continuances from January 15, 2019, to February 10, 2020, do not count toward the speedy trial deadline. On February 10, 2020, the trial court ordered that another mental health evaluation be performed and continued the matter until June 8, 2020. On March 16, 2020, the Supreme Court's emergency order tolled Arroyo's statutory speedy trial rights. Thereafter, the Court entered a series of additional orders extending the judicial emergency until after the June 8, 2020 hearing. Thus, even assuming without deciding that Arroyo properly objected to the continuance of his case on February 10, 2020, only 35 days elapsed between February 10, 2020, and March 16, 2020, which would count toward the

---

days previously allocated for trial was insufficient. Thus, even before the trial court rendered its ruling on Arroyo's motion to dismiss, he waived any potential argument that delay for any other continuances should count against the Commonwealth for speedy trial purposes. *See* Code § 19.2-243(4).

speedy trial deadline. Therefore, the delay attributable to the Commonwealth was at most 145 days, which is within the 152 and a fraction day requirement of Code § 19.2-243. The trial court did not err when it denied Arroyo's motion to dismiss the indictments for violation of his statutory speedy trial rights.

C. *The trial court did not err in rejecting Arroyo's proffered jury instructions.*

Arroyo asserts that the trial court erred in rejecting his proffered jury instructions concerning involuntary manslaughter, voluntary manslaughter, and heat of passion. We disagree.

"[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Payne*, 292 Va. at 869 (quoting *Lawlor*, 285 Va. at 228). As the challenged instructions were offered by Arroyo, the burden was on him to show that they included a "correct statement of the law, applicable to the facts of the case on trial, and expressed in appropriate language." *Miller v. Commonwealth*, 64 Va. App. 527, 547 (2015) (quoting *Shaikh v. Johnson*, 276 Va. 537, 546 (2008)).

Although he erroneously asserts otherwise, the record establishes that Arroyo did not proffer an involuntary manslaughter instruction for either victim. Arroyo also erroneously asserts that the trial court erred in failing to instruct the jury on voluntary manslaughter and heat of passion as to Barnes. But the trial court granted jury instructions on voluntary manslaughter and heat of passion relating to Barnes's killing. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Accordingly, we do not consider these contentions on appeal.

Finally, Arroyo asserts that the trial court erred in denying his proffered voluntary manslaughter and heat of passion instructions relating to Joseph's killing. "Second-degree murder and voluntary manslaughter are both lesser-included offenses of first-degree murder." *Woods v.*

- 15 -

*Commonwealth*, 66 Va. App. 123, 131 (2016). "Second-degree murder . . . is defined as a malicious killing." *Id.* "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)).

Voluntary manslaughter, on the other hand, is the unlawful killing of another without malice. *Id.* "'Heat of passion refers to the furor brevis which renders a man deaf to the voice of reason.' '[It] excludes malice when provocation reasonably produces fear [or anger] that causes one to act on impulse without conscious reflection.'" *Id.* (alterations in original) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Malice and heat of passion cannot coexist." *Id.* (quoting *Turner v. Commonwealth*, 23 Va. App. 270, 275 (1996)).

"In a trial for first-degree murder, 'a trial court must instruct the jury on the lesser-included offense of voluntary manslaughter if the evidence of heat of passion and reasonable provocation amounts to "more than a scintilla."'" *Id.* at 132 (quoting *Turner*, 23 Va. App. at 275). "When the evidence in a prosecution warrants a conviction of the crime charged, and there is no independent evidence warranting a conviction for a lesser-included offense, an instruction on the lesser offense should not be given." *Id.* (quoting *Commonwealth v. Leal*, 265 Va. 142, 145 (2003)).

Here, Arroyo testified that he knocked on Joseph's front door with a firearm in each hand. He admits that he heard Joseph walk to the front door and claimed to have seen P.A. in the kitchen alone. According to Arroyo, he "snapped" and discharged his firearm multiple times through the front door. Thus, not a scintilla of evidence tended to prove that Joseph provoked Arroyo or that he acted in the heat of passion when he fired repeated shots through the front door. The trial court did not err in denying Arroyo's proffered lesser-included instructions related to Joseph's killing.

D.  *The trial court did not err in finding the evidence sufficient to support Arroyo's convictions.*

Arroyo asserts that the trial court erred when it denied his motion to strike the charges and found the evidence was sufficient to support his convictions.  In challenging the trial court's denial of his motion to strike, Arroyo necessarily asserts that the jury should not have been allowed to even consider the charges because "[a] motion to strike challenges whether the evidence is sufficient to submit the case to the jury."  *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223).  As a result, his challenge raises the questions of whether the evidence adduced sufficiently presented "a *prima facie* case" of first-degree murder, use of a firearm in commission of a felony, shooting into an occupied dwelling, child abuse or neglect, and burglary for the jury to consider.  *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

### 1.  First-Degree Murder and Accompanying Firearm Charges

Arroyo argues that his evidence proved he was too intoxicated to form the requisite intent necessary for first-degree murder.  We disagree.

Murder in the first-degree is "any willful, deliberate, and premeditated killing."  Code § 18.2-32.  To support a conviction for use of a firearm during the commission of a felony, under Code § 18.2-53.1, the Commonwealth must prove that the defendant "use[ed] or attempt[ed] to use any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit murder."

In Virginia, it is well established that voluntary intoxication is generally "not an excuse for any crime."  *Tisdale v. Commonwealth*, 65 Va. App. 478, 482 (2015) (quoting *Wright v. Commonwealth*, 234 Va. 627, 629 (1988)).  The sole exception recognized by Virginia courts is when one's voluntary intoxication "negate[s] the deliberation and premeditation required for first degree murder," *id.* (quoting *Wright*, 234 Va. at 629), and "thereby reduce[s] the conviction from first-degree murder to second-degree murder," *id.*  To negate "the specific intent requisite for

- 17 -

. . . first-degree murder," a defendant must show "that he was *so greatly* intoxicated as to be incapable of deliberation or premeditation." *Id.* (emphasis added) (quoting *Essex v. Commonwealth*, 228 Va. 273, 281 (1984)). "While a person who has become so intoxicated as to be unable to deliberate and premeditate cannot commit any class of murder that is defined as a wil[l]ful, deliberate, and premeditated killing, mere intoxication from drugs or alcohol will not suffice to negate premeditation." *Jenkins v. Commonwealth*, 244 Va. 445, 458 (1992). "[S]o long as [the defendant] retains the faculty of willing, deliberating and premeditating, though drunk, he is capable of committing murder in the first degree; and if a drunk man is guilty of a wi[l]lful, deliberate and premeditated killing, he is guilty of murder in the first degree." *Duncan v. Commonwealth*, 2 Va. App. 717, 731 (1986) (quoting *Johnson v. Commonwealth*, 135 Va. 524, 531 (1923)).

Here, Webb testified that although Arroyo consumed a significant amount of alcohol on July 30, he drove them home from the pool. Once Webb and Arroyo arrived home, Arroyo drove to the store to buy cigarettes. When Arroyo returned, he went into his room and closed the door. Webb heard Arroyo rummage through his closet and the sound of something metal. Arroyo then exited his room and marched out the front door. Webb followed Arroyo outside and noticed that his car was parked as if ready to leave, which Webb noted was unusual. Arroyo then entered his car and drove away without incident.

Arroyo admitted that when he left his home the second time he drove to Joseph's home. Arroyo had two firearms with him—one that was already in his vehicle and one he had retrieved from his home. After the murders, Arroyo avoided detection for driving while intoxicated as he traveled through several states and fled from authorities. Based on the totality of the circumstances, a reasonable fact finder could conclude that Arroyo was not so greatly intoxicated that he could not

- 18 -

form the requisite intent to commit the premeditated murders with a firearm. The trial court did not err in denying Arroyo's motion to strike the charges of murder and felonious use of a firearm.

### 2. Maliciously Shooting into an Occupied Dwelling

Arroyo contends that the trial court should have granted his motion to strike the charge of maliciously shooting into an occupied dwelling because the Commonwealth failed to establish "the position and direction from which the gunshots were fired." We disagree.

It is unlawful for a person to "maliciously discharge[] a firearm within any building when occupied by one or more persons in such a manner as to endanger the life or lives of such person or persons." Code § 18.2-279. It is also unlawful for any person to "maliciously shoot[] at . . . any dwelling house or other building when occupied by one or more persons, whereby the life or lives of any such person or persons may be put in peril." *Id.*

Based on Arroyo's own testimony, a reasonable fact finder could conclude that Arroyo maliciously discharged a firearm at and within a dwelling. Arroyo admitted that after he knocked on the front door, he heard Joseph coming to the front door and saw P.A. in the kitchen. Despite knowing the home was occupied by Joseph and P.A., Arroyo shot 11 times through the front door, killing Joseph. After shooting through the front door, Arroyo then entered the home and shot and killed Barnes. Because a reasonable fact finder could conclude that Arroyo shot at or within an occupied dwelling he knew was occupied, the trial court did not err in denying Arroyo's motion to strike this charge.

### 3. Child Endangerment

Arroyo also argues that he did not recklessly endanger his children because there was no evidence that they were harmed during this incident. He argues that neither P.A. nor M.A. was present in the rooms where the shootings occurred. Although it was "traumatic" for M.A. to

witness Joseph being shot, Arroyo contends, that trauma is insufficient to prove reckless child endangerment. We disagree.

"Any parent . . . responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony." Code § 18.2-371.1(B)(1). This Court has held that "the statute does not require that a child actually suffer an injury as a result of a parent's act or omission." *Hannon v. Commonwealth*, 68 Va. App. 87, 93 (2017). "Rather, the act or omission must give rise to a 'substantial or probable risk of harm.'" *Id.* at 94 (quoting *Jones v. Commonwealth*, 272 Va. 692, 701 (2006)).

Arroyo admitted that he shot 11 times into and through the front door of the home that both his young sons occupied. As bullets careened through the front door, both M.A. and P.A. faced a substantial or probable risk of serious harm or death at the hands of their father. That neither child was injured during this incident is a fortunate coincidence. Because a reasonable fact finder could conclude that Arroyo's acts showed a reckless disregard for his children's lives with a substantial risk of harm, the trial court did not err in denying Arroyo's motion to strike these charges.

### 4. Burglary

In his assignment of error, Arroyo asserts that the trial court erred in denying his motion to strike the burglary charge. But Arroyo's brief contains no citation to legal authority to support this claim.

"Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.'" *Fadness v. Fadness*, 52 Va. App. 833, 850 (2008) (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)). "Unsupported assertions of error 'do not merit appellate consideration.'" *Id.* (quoting *Jones*, 51 Va. App. at 734). "A court of review is entitled to have the issues clearly

defined and to be cited pertinent authority. The appellate court is not a depository in which [Arroyo] may dump the burden of argument and research." *Id.* (quoting *Jones*, 51 Va. App. at 734). "[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a[n assignment of error] as waived.'" *Atkins v. Commonwealth*, 57 Va. App. 2, 20 (2010) (quoting *Parks v. Parks*, 52 Va. App. 663, 664 (2008)).

Instead of providing this Court with legal authority to support his challenge to the burglary conviction, Arroyo used the "'throw everything at the wall and hope something sticks' approach to appellate advocacy that this Court [has] condemned." *Coe v. Coe*, 66 Va. App. 457, 470 (2016) (quoting *Fadness*, 52 Va. App. at 850-51). This "tactic 'is as unappreciated as it is ineffective.'" *Id.* (quoting *Fadness*, 52 Va. App. at 851). "When a party believes the circuit court erred, it is the duty of that party 'to present that error to us with legal authority to support their contention.'" *Id.* (quoting *Fadness*, 52 Va. App. at 851). Because we find that Arroyo's failure to comply strictly with the requirements of Rule 5A:20 is significant, he has waived any challenge to his burglary conviction. *See Parks*, 52 Va. App. at 664 ("[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a question presented as waived.'" (quoting *Jay v. Commonwealth*, 275 Va. 510, 520 (2008))).

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.[11]

*Affirmed.*

---

[11] On December 11, 2023, Arroyo filed a "Petition to Proceed in Propria Persona (Proper Person)" with this Court. In the petition Arroyo asserts that he has relieved his court-appointed attorney and now wishes to proceed *pro se*. Arroyo's petition appears to contend that his attorney has failed to provide him with effective assistance of counsel. Claims of ineffective assistance of counsel may not be raised on direct appeal. Code § 19.2-317.1, which allowed direct appeal of such claims under certain circumstances, was repealed in 1990. 1990 Va. Acts, c. 74; *see also Walker v. Mitchell*, 224 Va. 568 (1983). In addition, counsel of record may not withdraw or terminate appearances except under procedures articulated in Rule 1:5(d)(1), and these procedures have not occurred in this case, so we decline to address Arroyo's request.